GULF, M. & N. R. R. Co. *v.* COLLINS.*

(Division A. May 28, 1928. Suggestion of Error Overruled July 18, 1928.)

[117 So. 593. No. 27135.]

*Corpus Juris-Cyc. References: Master and Servant, 39CJ, p. 705, n. 21; p. 1047, n. 13; On the rule as to law applicable to defense of assumption of risk under Federal Employers' Liability Act, see annotation in 47 L. R. A. (N. S.) 62; L. R. A. 1915C, 69; 12 A. L. R. 701; 36 A. L R. 918; 18 R. C. L. 830; 3 R. C. L. Supp. 856; 4 R. C. L. Supp. 1212; 5 R. C. L. Supp. 1004; 6 R. C. L. Supp. 1089; 7 R. C. L. Supp. 610.

*Welch & Cooper, Roy P. Noble* and *J. N. Flowers,* for appellant.

*Chas. C. Evans* and *W. L. Pack, Jr.*, for appellee.

244

Argued orally by *Ellis B. Cooper,* for appellant, and *W. L. Pack,* for appellee.

Cook, J. This suit was instituted by the appellee, Mrs. Ella Collins, administratrix of the estate of her husband, C. H. Collins, against the appellant, the Gulf, Mobile & Northern Railroad Company, for the death of her said husband, who was an employee of said railroad company, and from a verdict and judgment in favor of the appellee for the sum of seven thousand, six hundred eighty dollars this appeal was prosecuted.

The declaration was in two counts, both based upon the Federal Employers' Liability Act (45 USCA, sections 51-59; U. S. Comp. St., sections 8657-8665). The first

count, after making the averments necessary to bring the case within the provisions of the Federal Employers' Liability Act, alleged, in substance, that at the time of the accident, which resulted in his death, the decedent, C. H. Collins, was an employee of the appellant as head brakeman on one of its gravel trains which are used to distribute gravel along its line of railroad for the purpose of ballasting the track; that on and prior to the date of decedent's death, the track on a certain branch·line of appellant's railroad near the village of Little Rock, Miss., was in a dangerous state of repair; that one mile east of said village the road passes through a deep cut, and there is at that point a sharp curve and steep grade, and the railroad was at that point soggy and soft; that water would seep out of the sides of said cut and collect and remain on the sides of and underneath the track, thereby rendering it very dangerous for employees working on trains moving over it. It was then alleged that on the day the decedent lost his life, the gravel train upon which he was employed moved from Laurel, Miss., to Union, thence on a branch road eastward toward Meridian, with a train of ten cars of gravel, a locomotive, a caboose and a train wrecker, the gravel to be used for a ballast, and to be distributed eastward on this branch line; that the train was being backed, and while passing over said dangerous and defective piece of track in said cut and on said curve and grade, the decedent, Collins, in the discharge of his duties as head brakeman, was climbing down a ladder on the caboose, when one Carmichael, the foreman in charge of said train, gave a signal to the engineer to stop the train; that in response to said signal the engineer suddenly shoved on the brakes, causing a sudden and violent jerk or lurch of the caboose, and because of the defective condition of the track at that place, at a time when the train was running about twelve miles per hour, the said decedent was thrown from said caboose to the ground underneath said train, and was

run over by the caboose and two cars of gravel, and killed almost instantly; and alleged that the negligence of the appellant in permitting said track to be and remain in said defective condition was the proximate cause of the deceased's injury and death, for which an action had accrued to the widow and children for whose benefit the suit was brought.

The second count of the declaration repeated the allegations as to the condition of the track, and alleged that the train was ordered to move eastward with the gravel, and after it had moved about eight miles from Union, "and at a time when decedent was climbing down a ladder of the caboose of said train and while the same was passing over the defective place in the railroad track as aforesaid, the said train was suddenly caused to jerk or lurch with such an unusually hard and sudden jerk, that it was made extremely difficult to remain on top of said train. The train was moving at a rate of speed of about fifteen miles per hour over said highly defective track, when the brakes were suddenly applied. The jerk or lurch was so sudden, so violent, and so unusual, and being caused at the time, place, and under the circumstances as aforesaid, the said decedent Collins was suddenly thrown or jerked off of said moving train, without the giving of any signal or warning of any kind that said brakes would be so suddenly applied." It was then alleged that the decedent was injured and killed as a result of the negligence of the defendant, through its agents and employees, in handling said train, and in suddenly and violently causing it to jerk or lurch, thereby causing the decedent to fall from the train.

To this declaration, plaintiff filed a plea of the general issue, with notice thereunder setting up the defense of assumption of risk.

As to the condition of the track at the point where the injury occurred, one L. M. Taylor, a witness for the appellee, testified that the cut through which the track

ran was from twenty to twenty-five feet in depth; that some distance west of this cut an upgrade began, the high point or crest of which is in this cut; that from this cut eastward the track is downgrade; that in this cut on the south side of the track, there is a continuously running spring of water; that on the north side of the track the water seeped down, making the track wet and boggy at that point.

C. L. Griffin, the flagman on this gravel train, testified that he had been in the employ of the railroad for about ten years, and had worked with Collins on different trains for about nine years; that on the occasion in question the train consisted of ten cars and a caboose ahead of the locomotive and a wrecker behind it; that as head brakeman Collins' proper place on this train was on the front or head end of the caboose as these cars were pushed forward in front of the locomotive; that the wrecker was cut off and spotted at an overturned car, and then one Carmichael, the track supervisor and foreman who was directing the movements of the train, directed that they proceed eastward to unload the gravel; that Collins returned to the caboose, and he (Griffin) got on behind the engine; that when about one-half of the train had passed over the crest or peak of the grade in the cut in question, Carmichael gave the engineer a "flag down" signal, which meant "stop;" that the engineer immediately applied his brakes, with the result that there was a sudden and violent jerk of the train; and that the conditions which caused this jerk to be unusual and violent were the nature of the signal given, the condition of the track, and the fact that the train was over the crest, that is, part of the train had passed over the crest or peak, and the other part was on the approach thereto.

Griffin further testified that after the brakes were applied on the train, it ran about one hundred feet, and that just before this stop signal was given, Collins was at the ladder extending from the top of the caboose to

the platform thereof; his testimony on this point being as follows:

"Q. Did you see Mr. Collins about that time? A. Just about the time this signal was given, he went over the top of the caboose and reached for the ladder—just before it was given.

"Q. Was that just before the jerk was made? A. Yes, sir.

"Q. The last time you saw him was where? A. At the ladder.

"Q. You say you saw Mr. Collins the last time at or near the ladder of the caboose? A. About the time he took hold of it was the last time I saw him. He stepped down the ladder a couple of steps and the cupola took him out of sight.

"Q. At the time of this occurence of your own knowledge, you don't know where Mr. Collins was? A. No, I can't say.

"Q. You don't know whether on the ladder or on the platform? A. I can't say."

This witness further testified that when the train stopped, he got down off the locomotive and went ahead to cut the air out of the gravel cars, and that while performing this duty, he found Collins' mutilated body under the train, the physical facts showing that the body had been dragged along the track, and that the caboose and two and a half cars had passed over it. This witness also testified that the jerk caused by the sudden application of the brakes would be "harder with the slack in—when the slack runs out it makes a hard jerk;" and that at the time the engineer applied his brakes, the train was a little more than half over the crest or peak of the grade or hill.

The appellant's only assignment of error is based upon the action of the court below in refusing to grant the peremptory instruction requested by it. The contention of appellee, as stated in the brief of counsel, is that the de-

cedent at the time of the accident was in his proper position on the caboose, having no knowledge of the exact spot where the gravel was to be unloaded, and that he was in the act of climbing down the ladder of the caboose at the time the signal was given to the engineer to stop; and that when this signal was given, the engineer suddenly and without any warning, made an unusually quick and violent application of the brakes, with the result that there was an unusually violent jerk or lurch of the train, which threw Collins from the train and caused his death.

No witness was able to testify as to the position of Collins at the time of the application of the brakes, or that he fell from the ladder on the caboose when the brakes were applied; and the only facts and circumstances in evidence from which an inference may be drawn that he was so caused to fall are those testified to by the witness Griffin. He testified that he saw the decedent start down this ladder and pass out of sight behind the cupola on the caboose just before the signal to stop the train was given. He testified that the train moved about a hundred feet after the brakes were applied. He also testified that the body of the deceased was ''dragged along the rail for a piece.'' He was then asked how far that was, and he replied, ''Caboose and two and a half car lengths.'' In another place he testified that the caboose and two and a half gravel cars passed over the body of the decedent, and it may be that the witness did not intend by the answer quoted above to testify that the body of the decedent was dragged the length of the caboose and two and a half cars. If not, the fact remains that he testified that it was ''dragged along the rail for a piece.'' The testimony is undisputed that the cars and caboose were forty feet long, and this being true, the train necessarily moved one hundred and forty or more feet after Collins fell from it. The witness Griffin was the only witness to testify that there was any unusual or violent jerk. At the time of the application of the

brakes, Griffin was on the locomotive, which was proceeding upgrade with the slack in on that portion of the train which had not reached the crest of the grade, while Collins was on the caboose eleven cars away, on that portion of the train which had passed over the crest, with the slack necessarily out; consequently his testimony as to the force of the jerk on the caboose was necessarily largely conjecture, as likewise is the inference that the decedent was on the ladder at the time of the application of the brakes and was thrown therefrom by a sudden and violent jerk of the train.

There are facts in evidence which as readily support the inference that the decedent had gone down the ladder and into the caboose before he fell from the train. The administratrix, the wife of Collins, testified that Collins spent the night before the accident in the caboose. Griffin testified that he had his breakfast on the caboose on the morning of the accident about four forty-five a. m. The evidence shows that there was a pantry or receptacle for food, as well as an oil stove, on the caboose. The accident occurred about noon, and the testimony is uncontroverted that Collins had no food in his hand while the employees were placing the wrecker at the overturned car. After this wrecker was spotted, Collins at once returned to his station on the caboose, and when his body was discovered by Griffin a few minutes later, he had bread in his mouth, and a piece of bread was lying near his body. As to whether Collins had gone into the caboose for food before the accident and at the time thereof was on the rear platform, or on the ladder, or as to the cause of the fall, is left in the realm of speculation and conjecture.

In the case of *Patton* v. *Texas & P. R. Co.,* 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361, in discussing the rule that obtains in a suit by an employee under the Federal Employers' Liability Act, the court said that—In such case "the fact of accident carries with it no presumption of negligence on the part of the employer, and it is an

affirmative fact for the injured employee to establish that the employer has been guilty of negligence," and "it is not sufficient for the employee to show that the employer may have been guilty of negligence—the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs. . . ."

In addition to this state of uncertainty in the proof as to the manner in which the decedent lost his life, the evidence wholly fails to show that the engineer knew or should have known that Collins was in a position of peril at the time he applied the brakes, or that he was in a situation in which a jerk would be dangerous to him. The plaintiff's proof shows that Collins had passed out of sight of those on the locomotive before the stop signal was given; and the engineer testified positively that he did not know where Collins was at the time he applied the brakes. Assuming that, in view of the fact that a brakeman or other employee was required to ride on the caboose when the train was backing, the engineer knew that some employee was on the caboose, it does not follow that he knew that such employee was in a position of peril. On the caboose were places of perfect safety from the dangers of emergency or sudden stops.

We do not think it can be said that there is any real conflict in the evidence as to whether Collins knew where the train was to be stopped to unload the gravel. While Griffin testified that no one gave any orders in regard to that matter, the force and weight of this statement is shown by his answer to a question as to whether Collins knew where the gravel was to be unloaded, which was: "I do not suppose he did. I did not hear any orders." The conductor testified that when they were preparing to leave the point where they spotted the wrecker, he told Collins to return to his place on the caboose, while they proceeded to the top of the grade to there unload the gravel. It is a well-settled principle that an employee assumes the ordinary risks and dangers incident to his employment, and this record shows without dispute that the decedent was a brakeman of long experience, and necessarily was familiar with the risks of sudden stops of freight trains, and from his knowledge and experience he would be expected to protect himself against the dangers of such stops.

All the members of the train crew, except Griffin, testified that they did not notice any unusual jerk of the train at the point where they were stationed thereon; and while Griffin testified that the jerk on the locomotive was unusually violent, we have only the inference or conclusion that the jerk was violent on the caboose, which was eleven cars away and on a grade exactly opposite to the grade the locomotive was on; and in this state of the record, we think the language of the supreme court of the United States in the case of *Gulf, Mobile & Northern R. Co.* v. *Wells* (decided January 3, 1928) 48 S. Ct. 151, 72 L. Ed. ——, is applicable and controlling. In that case the court said that—Wells "testified on cross-examination, that while the running in of slack on freight trains jerks or lurches them to a certain extent, this was a severe jerk such as he had never experienced before on a train; and, finally, that although he had seen such jerks on through freight trains, he had never seen them in local freights."

The court then gave a summary of the evidence for the defendant, and stated that—"'It is urged here in behalf of Wells that, despite this evidence, the question of the engineer's negligence was properly submitted to the jury because of an inference to be drawn from Wells' own statement that 'the engine gave an unusual jerk,' which was more severe than any he had ever experienced or seen on a local freight train. We cannot sustain this contention. In the first place, there was no evidence that the engineer knew or should have known that Wells was not on the train, but was attempting to get on it after it had started and was in a situation in which a jerk of the train would be dangerous to him. [Citing authorities.] Aside from this, Wells' statement that the jerk was given by the engine was, obviously, a mere conjecture, as he was then at the side of the caboose, ten car lengths away, where he could not see what occurred on the engine. And his opinion that the jerk was unusual and severe as compared with those which he had previously experienced on local freight trains, had no substantial weight; his situation on the ground by the side of the moving train, after his foot had turned on the piece of coal and he had gone 'down,' being plainly one in which he could not compare with any accuracy the jerk which he then felt with those he had experienced when riding on freight trains.''

It follows from the views herein expressed, we are of the opinion that the peremptory instruction requested by the appellant should have been granted. The judgment of the court below will therefore be reversed, and judgment entered here for the appellant.

*Reversed, and judgment for appellant.*